1    COOLEY LLP
MATTHEW D. BROWN (196972) (brownmd@cooley.com)
2    CANDACE A. JACKMAN (267599) (cjackman@cooley.com)
DAVID S. HOUSKA (295918) (dhouska@cooley.com)
3    101 California Street, 5th Floor
San Francisco, CA 94111-5800
4    Telephone: (415) 693-2000
Facsimile: (415) 693-2222
5

6    Attorneys for Defendant
BITCASA, INC.
7

8                UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
9                  SAN FRANCISCO DIVISION

10

11    SHAWN ROMACK, individually and on      Case No. C 14-05005 WHA
behalf of all others similarly situated,
12                                **DEFENDANT BITCASA, INC.'S**
           Plaintiff,             **OPPOSITION TO PLAINTIFF'S MOTION**
13                                **FOR TEMPORARY RESTRAINING ORDER**
     v.
14                               Date:        November 19, 2014
BITCASA, INC.,                    Time:        10:00 a.m.
15                               Dept:.       8
           Defendant.       Judge:      Hon. William H. Alsup
16

17

18

19

20

21

22

23

24

25

26

27

28

## I.	INTRODUCTION

On November 12, 2014, Plaintiff Shawn Romack sued Bitcasa, Inc. and filed an *ex parte* motion for a temporary restraining order ("TRO").  Plaintiff's motion told the Court that Bitcasa was "ransom[ing]" users' data to extract higher fees, and urged it to enjoin Bitcasa from going forward with plans to wrongfully delete certain user data on November 15th.  With just these accusations in hand, and with November 15th fast approaching, the Court entered an order on November 13th barring Bitcasa from deleting the data of any user, like Plaintiff, with an unlimited-storage "Infinite" plan.  But Plaintiff told the Court his side of the story.  Contrary to Plaintiff's accusations about ransom and extortion, Bitcasa's changes in service were motivated not by greed, but by a ███████████████████████████████████████████ ████████████████████████████████████████████.  Unfortunately, Plaintiff, without presenting these critical facts, has obtained a TRO that is now costing Bitcasa ██████ a day to comply with and that will almost certainly push the company to failure if it is extended.

Bitcasa went to market in 2011 with novel software and a business plan that, it believed, would allow it to offer unlimited, secure data storage in the "cloud" for a low monthly fee.  Three years and ██████ Infinite plan users later, however, Bitcasa was all the wiser.  Although most used the service to store only a modest amount of data, Bitcasa's costs to store data soared, in large part because of a tiny percentage of its users (0.5%)—including Plaintiff—whose accounts were larded with impossibly large amounts of data.  Although Bitcasa's encryption technology would not allow it to see just what these users were storing, Bitcasa suspected that the bulk of its heaviest users were violating Bitcasa's Terms of Service ("TOS"), for example, by using personal accounts for business purposes.

By the fall of 2014, ███████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████████

Bitcasa announced key overhauls on October 23, 2014.  Among other things, Bitcasa modified the service by discontinuing the Infinite plan, capping users' storage at 10 terabytes

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANT BITCASA, INC.'S
OPPOSITION TO MOTION FOR TRO
NO. C 14-05005 WHA

(TB) each, and, for under 1% of users, increasing the price of storage. In conjunction with the rollout of a new software infrastructure upgrade, Bitcasa also required users to migrate their data to new servers, and will be deleting all of the data from its old servers—changes expected to save it approximately ███████ per month in data-storage costs. (Declaration of Brian Taptich in Support of Defendant's Opposition to Motion for TRO("Taptich Decl.") ¶ 11, filed herewith.)

Plaintiff is upset about these changes and he has filed a lawsuit. But, under established law, he has no right to prevent Bitcasa from moving forward with its attempt to overhaul the ████████████████████████████████████████████████████████████████ An injunction is an extreme form of relief, available only when a party is otherwise likely to suffer irreparable harm not compensable with damages. Thus, an injunction may issue where a plaintiff proves (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Additionally, under established law, "the injunction must be limited to apply only to the individual [named] plaintiffs unless the district judge certifies a class." *Zepeda v. INS*, 753 F.2d 719, 727 (9th Cir. 1983).

Plaintiff cannot conceivably obtain an injunction in light of these standards. Not only are Plaintiff's claims meritless—since Bitcasa's Terms of Service gave Bitcasa the right to change its services at any time, and because Bitcasa acted reasonably, as discussed further below—but he cannot conceivably prove the most critical element required for injunctive relief—a likelihood of irreparable harm. Plaintiff concedes that he can avoid having his data deleted by migrating to Bitcasa's new service and paying $99 for an additional month—more than twice the length of his proposed injunction and easily enough time to finish downloading the data he claims he has been "feverishly" trying to retrieve. Because Plaintiff's purported harm is reasonably avoidable, it is not irreparable as a matter of law. *See, e.g.*, 1 Witkin, Summ. of Cal. Law, Contracts, § 915, p. 1012 (10th ed. 2005 & Supp. 2012) ("The plaintiff cannot recover for harm that he or she could have foreseen and avoided by reasonable effort and without undue expense."). Equally fatal, Plaintiff has no right to seek injunctive relief on behalf of "all Infinite plan subscribers" (Mot. for

TRO 1), because the Court has not certified a class. *Zepeda*, 753 F.2d at 727. And, there is simply no evidence that "all Infinite plan subscribers" would either need or want additional time to download their data; to the contrary, Bitcasa's data shows that *thousands* have already completed their migration to Bitcasa's new service.

Finally, both the equities and the public interest in this case weigh overwhelmingly against extension of the TRO. Compliance with the TRO costs Bitcasa ███ a day in data storage fees. Those costs will approach ██████ by the time the Court's initial TRO expires, and will reach █████ if Plaintiff prevails on his request for a 14-day TRO. ████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ █████ (Taptich Decl. ¶ 16.) Weighed against the purported harm to Plaintiff—$99 at most— extending the TRO would not serve the public or equity.

For these reasons, and as further explained herein, Plaintiff's motion for a TRO should be denied and the current TRO vacated.

## II. STATEMENT OF FACTS

### A. Bitcasa's History

#### 1. Bitcasa envisions inexpensive, unlimited, secure cloud storage.

Bitcasa provides "cloud" storage solutions to the public. (Taptich Decl. ¶ 2.) Using Bitcasa, users can upload their data to a central server, which they can later use to access, share, and download their files from any computer or web-enabled device. (Taptich Decl. ¶ 2.) Bitcasa does not actually own its own servers, but rents server space from Amazon Web Services (AWS). (Taptich Decl. ¶ 2.)

Bitcasa came to the market with a vision of providing highly secure, unlimited data storage in the cloud. It offered two key value propositions. First, Bitcasa offered its proprietary "zero-knowledge" encryption, which makes it impossible for Bitcasa or third parties to know what particular data resides in a particular user's account. (Taptich Decl. ¶ 3.) Data is decrypted and reconstructed only when a user logs in to the service. (Taptich Decl. ¶ 3.) Second, Bitcasa believed it could economically offer unlimited storage to its customers for the low fixed price of

$99 a year. Bitcasa called this storage option the Infinite plan. To make this possible, Bitcasa's utilized "convergent encryption," which allows secure deduplication of data across multiple distinct users. (Taptich Decl. ¶ 4.) Bitcasa management at the time believed that the business model would be successful if there were a sufficiently high number of lower-volume users, using the service, as intended, for personal use, not group or commercial use. (Taptich Decl. ¶ 4.)

> **2.    Data-storage costs overwhelm Bitcasa's business model.**

After offering the service in "beta" for some time, Bitcasa began offering the service to the public on a paid basis in early 2013. (Taptich Decl. ¶ 5.) Like the overwhelming majority of start-ups in Silicon Valley, however, Bitcasa's vision soon collided with reality, and in particular, the very real costs of storing its users' data. Several problems emerged. First was the problem of "garbage collection." By design, the company's advanced encryption software gave it no visibility into the files owned by any particular users. Unfortunately, this left the company with no way to know if particular data was owned by *any* active account and, thus, no reliable way to delete orphan data. (Taptich Decl. ¶ 6.) Thus, over time, the company was paying to host an increasing amount of junk data. (Taptich Decl. ¶ 6.)

In addition, Bitcasa was being dragged down by a small group of users storing inordinate amounts of data on service. Most users uploaded comparatively modest amounts of data, with 99.5% of all users (and ███ of Infinite plan users) uploading 1 terabyte or less of data.[1] (Taptich Decl. ¶ 7.) However, the last 0.5% of users were uploading staggering volumes of data. For example, ███ of all users were uploading more than 10TB—the data equivalent of 3.5 million photos or over 5,000 high-definition movies. (Taptich Decl. ¶ 7.) One Infinite user, in particular, used Bitcasa to store *82TB of data*—enough space for 28.7 million photos or nearly 42,000 movies—singlehandedly costing Bitcasa approximately ███ or more *per month* in server storage fees. (Taptich Decl. ¶ 7.)

---

[1] One terabyte or "TB" is equal to 1,000 gigabytes or "GB."

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Bitcasa's higher-than-expected data-storage costs led to deeper, more sustained losses than it had anticipated.  (Taptich Decl. ¶ 7.)[2]  For all these reasons, the personal data storage business, originally envisioned as a brand-building, █████████████████████████████ █████████████████████

**3.**    ███████████████████████████████████████████████

A new CEO took the helm in September 2013.  Shortly thereafter, in an attempt to turn around the struggling business, the company increased the cost of Infinite plan storage to $99/month or $999/year, though it continued to offer the old $99/year rate to existing Infinite plan users.  (Taptich Decl. ¶ 8.)  Bitcasa continued to offer a limited "Free" option, and introduced two new options for paid storage plans: up to 1TB of data for $10 a month or $99 a year, or up to 5TB of data for $49 a month or $499 a year.  (Taptich Decl. ¶ 8.)  ████████████████████████████ ████  Since the start of 2014, Bitcasa has incurred approximately ████████ in hosting charges to AWS and is now over ████████████  (Taptich Decl. ¶ 9.)  Over the same time period, Bitcasa took in just████████████████.  (Taptich Decl. ¶ 9.)

**4.        Bitcasa overhauls its services in October 2014.**

████████████████████████████████████, Bitcasa's new leadership overhauled the business in October 2014.  Addressing its server storage costs head-on, Bitcasa announced the discontinuation of its "Infinite" data storage plan, capping all users' total data storage at 10TB, and raising prices for users storing the very highest volumes of data on the service.  (Taptich Decl. ¶ 10.)  For the vast majority of users, pricing remained unchanged: the 99.5% all users (and ████ of Infinite plan users) with less than 1TB on the service still pay only $99 per year under Bitcasa's "Premium" plan.  Bitcasa's rate change affects only the 0.5% of all users (and ████ of Infinite plan users) who store more than 1TB of data, elevating their costs to $99/month or $999/year for up to 10TB of data under the new "Pro" plan.  (Taptich Decl. ¶ 10.)  For those users

---

[2] Because of these astonishing volumes of data, Bitcasa began to suspect that some Infinite account holders users were violating Bitcasa's Terms of Service, for example, by using personal accounts for business purposes.  (Taptich Decl. ¶ 7.)

Cooley LLP
Attorneys At Law
San Francisco

who had time left on their prior Infinite plan accounts, Bitcasa is providing a full refund for the unused portion of their service.  (Taptich Decl. ¶ 12.)

As part of its overhaul, Bitcasa is also upgrading its software infrastructure to improve performance for users and to enable the company to identify junk data from inactive users (while retaining security), to better manage server storage costs in the future.  (Taptich Decl. ¶ 11.)  This further involves moving user data from one set of AWS servers to another, and asking users to expressly confirm that they want to migrate their data.  (Taptich Decl. ¶ 11.)  This migration process will ensure that all of the data migrated to the new servers actually belongs to current users (which Bitcasa otherwise has no way to know, due to its encryption software), allowing it to delete unwanted data from users who no longer use the service.  (Taptich Decl. ¶ 11.)  Bitcasa estimates that these changes will save it approximately ███████ per month in data storage costs and position it to operate profitably in the future.  (Taptich Decl. ¶ 11.)

On October 23, Bitcasa announced these changes to users, sending an email to each user, along with subsequent reminder emails, displaying pop-up messages within Bitcasa applications, and posting the news on its website, Facebook page, Google+ account, Wordpress blog, and Twitter account.  (Taptich Decl. ¶ 12.)  As Bitcasa advised users of the changes, it told users that they had until November 15, 2014 to either migrate their data to Bitcasa's new system or download it from Bitcasa and take it with them; all remaining data would then be deleted. (Taptich Decl. ¶ 12.)  Bitcasa'a plan was to pull the proverbial plug from the old server on November 16, 2014, allowing it to cease payment for storage of the old data.  (Taptich Decl. ¶ 12.)

### 5.    Bitcasa's Terms of Service contemplate changes to its services.

The changes to Bitcasa's services, including the required migration to new servers, were fully consistent with Bitcasa's mandatory Terms of Service ("TOS").  In the Terms of Service, all users acknowledged the evolving nature of Bitcasa's business and the risk that Bitcasa may need to modify or terminate its services, agreeing:  "The Services may continue to change over time as we refine and add more features.  We may stop, suspend, or modify the Services at any time without prior notice or liability to you."  (TOS at 19.)  To preserve maximum flexibility, Bitcasa

Cooley LLP
Attorneys At Law
San Francisco

Defendant Bitcasa, Inc.'s
Opposition to Motion for TRO
No. C 14-05005 WHA

expressly "reserve[d] the right to suspend or end the Services at any time, with or without cause, and with or without notice." (TOS at 36.) In the event of "suspen[sion]" or "termination," Bitcasa pledged to "make commercially reasonable efforts to let you know in advance and help you retrieve data," subject to exceptions. (*Id*.)

### 6. Bitcasa helps users download and migrate their data.

Although Bitcasa would have preferred to provide users with a longer migration period, it settled on a 23-day period, at a cost of ▮▮▮▮▮ per day, or ▮▮▮▮▮▮▮ in storage fees. (Taptich Decl. ¶ 16.) For users who decided to migrate their data (and, for 99.5% of users, pay the same monthly cost), Bitcasa's estimates suggest that 1TB of data could be migrated in approximately 5 hours, and that up to 10TB of data could be migrated in two days. (Taptich Decl. ¶ 13.) Bitcasa also knew that 23 days would be more than enough for the vast majority of users to download their data, if they chose not to migrate to the new service. For example, for the 99.5% of all users (▮▮▮▮ of Infinite plan users) with 1TB or less on the service, users could download their data in 3 days using an average broadband connection. (Taptich Decl. ¶ 13.) For the small percentage of users with 1TB to 5TB, a full download could be achieved in less than 15 days using an average connection. (Taptich Decl. ¶ 13.) Users with faster connections could complete their downloads at up to five times those speeds, and downloads can go multiple times faster if more than one computer or web-enabled device is used. (Taptich Decl. ¶ 13.)

Bitcasa worked hard to help users make the most of the 23-day migration window. In anticipation of the migration, Bitcasa hired three temporary customer support employees, giving Bitcasa a total of ten employees dedicated to supporting users through the transition. (Taptich Decl. ¶ 14.) Over the migration period, these employees responded to user posts in Bitcasa's Community Forums, addressed requests submitted through the Help Center, and responded to questions through email. (Taptich Decl. ¶ 14.) In all, they responded to more than 8,800 help tickets. In addition, throughout the migration, Bitcasa's employees continued to provide updates, reminders, tips, and help, through the Bitcasa website, social media, and forums. (Taptich Decl. ¶ 14.)

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Bitcasa's data shows that Infinite plan users were able to migrate their data within the migration window. Of Bitcasa's roughly ███ Infinite plan users, well over ███ successfully migrated their data to Bitcasa's new system, with about ███ migrating to a paid plan, and another ███ migrating to a free account (Taptich Decl. ¶ 14.) Bitcasa has no way to track which users elected to download their data, but believes that a large number of users did so in anticipation of the November 15 deadline.

### B. Plaintiff's Lawsuit

Three weeks into the migration period—and just three days before the migration deadline—Plaintiff filed a class action lawsuit, putatively on behalf of all Infinite plan subscribers in the U.S. Plaintiff contends that Bitcasa failed to give users sufficient time to save their data from deletion, allegedly in breach of the TOS, the implied covenant of good faith and fair dealing, and the UCL. He claims that "Bitcasa is holding . . . customers' data for ransom, attempting to force them to accept significantly more expensive and/or otherwise inferior Bitcasa storage plans or risk losing their important data." (Compl. ¶ 26.) He seeks a 14-day TRO barring Bitcasa from "carrying out its plan to delete Plaintiff's and other Infinite plan customers' remaining data on November 15, 2014." Although Plaintiff states in his declaration that he "contacted Bitcasa to let them know that it is impossible for me to retrieve all of my data by the November 15, 2014 deadline" (Romack Decl. ¶ 8), Bitcasa's records do not show any contact by Plaintiff with the company's technical support team since 2013, well before the recent changes were announced. (Taptich Decl. ¶ 17.)

Plaintiff currently stores 7.7TB of data on Bitcasa, which is enough space to store 1.6 *million* songs, 2.7 *million* photos, or nearly 4,000 high-definition movies. Plaintiff claims he made "feverish[]" efforts to download as much of his data as possible, but that downloading his data by the November 15, 2014 deadline was "impossible." (Romack Decl. ¶ 7-8.) Absent court intervention, Plaintiff claims that he stands to lose "very important data, including photographs and other personal data that is really important to me, that does not exist elsewhere, and that is simply not replaceable." (Romack Decl. ¶ 9.) Plaintiff admits, however, that he could avoid having his data deleted by migrating his data and paying Bitcasa's new rates ($99 a month if he

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

chose to migrate all of his currently stored data) (*see* Compl. ¶ 26), even if for just one month, then canceling his account.

**C.** **The TRO is harming Bitcasa** ███████████████████████████

On November 13, 2014, the Court entered Plaintiff's proposed TRO in part, enjoining Bitcasa from deleting the data associated with any Infinite plan until November 20, 2014. (Order, Dkt. No. 6.) Although the TRO has been in place for only five days, its has already harmed Bitcasa's business ██████████████████████████████

To comply with the TRO, Bitcasa must keep all of its data live on its old AWS servers, at a devastating cost of ████ per day—forcing it to incur the very costs it has restructured its business to avoid. (Taptich Decl. ¶ 16.) In particular, although the TRO applies only to Infinite plan users (of which there are approximately ████ worldwide), Bitcasa has no way to tell which data belongs to these users, due to its encryption technology, other than by asking each user to log in with his user name and password. (Taptich Decl. ¶ 11.) Thus, to comply with the current TRO, and to comply with any extension of the TRO, Bitcasa must continue to pay the costs of storing all data for *all of the* ████ *people who have used Bitcasa since its launch—even those who have already migrated identical data to Bitcasa's new service.* (Taptich Decl. ¶ 11.) At a rate of ████ per day, Bitcasa already will incur ████ in data-storage costs just in complying with the short-term TRO already entered by the Court. *Bitcasa will incur a total of* ████ *in data-storage costs if Plaintiffs prevail on their request for a full 14-day TRO.*

█████████████████████████████████████████████

██████ (Taptich Decl. ¶ 16.) ████████████████████

████████████████████ (Taptich Decl. ¶ 16.) ████████████

████████████████████████████ (Taptich Decl. ¶ 16.)

**III.** **LEGAL STANDARD**

An injunction is an equitable remedy. "It is not a remedy which issues as of course," but instead should issue "only where the intervention of a court of equity is essential in order effectually to protect property rights against injuries otherwise irremediable." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311-12 (1982) (citations and internal quotation marks omitted).

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**DEFENDANT BITCASA, INC.'S**
**OPPOSITION TO MOTION FOR TRO**
**NO. C 14-05005 WHA**

"[T]he basis for injunctive relief [preliminary or permanent] in the federal courts has always been *irreparable injury* and the *inadequacy of legal remedies*." *Id.* at 312. Accordingly, a plaintiff seeking injunctive relief must establish that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20. A plaintiff carries the burden of persuasion and can only obtain the extreme relief offered by making a "clear showing" of his or her entitlement to relief. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

## IV. ARGUMENT

### A. Plaintiff cannot obtain a TRO to enjoin the deletion of the data of others.

Plaintiff asks the Court to enter a TRO barring Bitcasa not only from deleting his data, but from deleting the data of any other Bitcasa user who was an Infinite plan user as of October 23, 2014. Under established Ninth Circuit precedent, however, Plaintiff cannot obtain relief on behalf of a putative class before the Court determines whether class treatment is suitable.

The Ninth Circuit has repeatedly affirmed that "the injunction must be limited to apply only to the individual [named] plaintiffs unless the district judge certifies a class." *Zepeda*, 753 F.2d at 727; *Nat'l Ctr. for Immigrants Rights, Inc. v. INS*, 743 F.2d 1365, 1371 (9th Cir. 1984) (remanding classwide injunction because, "in the absence of class certification, the preliminary injunction may properly cover only the named plaintiffs"), *vacated and remanded on other grounds*, 481 U.S. 1009 (1987). This limitation stems from the "general rule that a federal court may not attempt to determine the rights of persons not before the court." *Bresgal v. Brock,* 843 F.2d 1163, 1170 (9th Cir. 1987). Applying that rule in *Zepeda*, for example, the Ninth Circuit vacated and remanded an injunction that purported to apply to non-party putative class members, even where the plaintiffs had demonstrated their individual entitlement to injunctive relief. *Zepeda,* 753 F.2d at 727-28 (collecting cases and discussing rule).

In light of *Zepeda*, Plaintiff has no basis to seek relief on behalf of the putative class of "all Infinite plan subscribers." No class has been certified. Under *Zepeda*, Plaintiff cannot obtain relief on behalf of absent class members, whom he does not presently represent in the litigation, who are not before the court, and who likely never will be parties to the case. *Zepeda*, 753 F.2d

1    at 727; *see also Schultz v. Armstrong*, No. 3:12-cv-0058-BLW, 2012 WL 3201223, at \*4-6 (D.

2    Idaho Aug. 2, 2012) (granting the plaintiff's motion for individual injunctive relief, but declining

3    to extend that relief to putative class members because, under *Zepeda*, "the Court lacks authority

4    to enjoin [the defendant] on behalf of those not currently party to the suit").[3]

5      Nor does it appear that a class could be certified in these circumstances. Plaintiff claims

6    that it was "impossible" for him to download his 7.7TB of data and that he would be "devastated"

7    by the deletion of his remaining data on Bitcasa's system. But this alleged experience bears no

8    resemblance to those of the vast majority of Infinite plan users. More than ▮ Infinite users

9    have migrated their data to Bitcasa's new system, ensuring that their data will be preserved, to the

10   extent they want it. Many more have successfully removed their data from Bitcasa's servers and

11   only a bare handful have expressed an inability to get their data out in time. Thus, Plaintiff's

12   proposed injunction is vastly overbroad because it would hamstring Bitcasa's ability to delete the

13   data of the class members who neither want nor need the protection of an injunction. These are

14   the very concerns that animate *Zepeda*.

15      Moreover, even if Plaintiff could overcome *Zepeda*, Plaintiff cannot obtain a classwide

16   TRO because he makes no attempt to meet the *Winter* standard with respect to unnamed members

17   of the putative class. The proposed class includes more than ▮ Infinite users. Yet Plaintiff's

18   motion focuses only on his own unique circumstances and on the alleged irreparable harm that

19   would accrue to him, *personally*, in the absence of an injunction. Plaintiff's declaration shows

20   that he has no direct knowledge of the situation faced by *any* other Bitcasa user. Instead, he

---

21   [3] Nor does this case present one of the rare scenarios where a classwide injunction is necessary to

22   afford complete relief to the named plaintiff. *E.g.*, *Lavan v. City of L.A.*, 797 F. Supp. 2d 1005, 1019 (C.D. Cal. 2011) (when homeless citizens challenged L.A.'s practice of summarily

23   destroying possessions left unattended in public, a classwide injunction was appropriate since it would be impossible to determine whether unattended belongings were the property of the named

24   plaintiffs or third parties); *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501-1502 (9th Cir. 1996) (statewide injunction against enforcement of California's mandatory helmet law

25   was appropriate because in practice it would be impossible to keep all law enforcement officers in California from pulling over only the 14 named plaintiffs). If the Court determines that Plaintiff

26   merits injunctive relief, Bitcasa can download his data for him, if he provides his login

27   information and password. Because of Bitcasa's zero-knowledge encryption, it cannot isolate Plaintiff's data without his help.

28

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

11.

DEFENDANT BITCASA, INC.'S
OPPOSITION TO MOTION FOR TRO
NO. C 14-05005 WHA

speculates that "many other Bitcasa customers are in the same boat as me," based on his purported review of "several blog and community forum posts" he read online. (Romack Decl. ¶ 10.) Under *Winters*, Plaintiff's showing is insufficient to support the issuance of an injunction as to any other Infinite plan users, *much less as to every single one.*

In light of *Zepeda*, and given Plaintiff's failure to address the *Winter* factors for the unnamed members of the class, Plaintiff's proposed injunction is fatally overbroad to the extent that it seeks to bar deletion of other people's data. Plaintiff has no right to a TRO on behalf of an uncertified class.

**B.      Plaintiff cannot obtain a TRO to enjoin even the deletion of his own data.**

Plaintiff cannot establish even his own entitlement to a TRO. Most strikingly, Plaintiff cannot show a likelihood of irreparable harm because he admits that he could avoid the deletion of his files simply by migrating to Bitcasa's new service and paying $99 for an additional month's storage, which would give him ample time to complete the download of his data, if he so chooses—even more time than he is seeking in his motion for a TRO. This dooms his motion for a TRO as a matter of law. None of the remaining *Winter* factors support issuance of an injunction, either:  Plaintiff is not likely to prevail on his claims; and he cannot show that either the balance of equities or the public interest supports issuance of a TRO.

**1.      Plaintiff is highly unlikely to succeed on the merits of his claims.**

Plaintiff's bid for an injunction turns on his claim that, Bitcasa breached, and will breach, various duties to Plaintiff and other Infinite plan users by "terminating [class members'] data accounts and deleting their data" in accordance with its plans announced on October 23, 2014. But that claim is not viable under any of Plaintiff's legal theories.

**a.      Plaintiff's claim for breach of contract likely will fail.**

Plaintiff concedes, as he must, that the TOS give Bitcasa the express right to "stop, suspend, or modify the Services at any time without prior notice or liability to you." (TOS at 19.) Plaintiff claims, however that Bitcasa's deletion of user data will breach the provision of the TOS providing that, "[i]f we suspend or terminate your use, we will make commercially reasonable

efforts to let you know in advance and help you retrieve data, ….” (TOS at 36; Complaint, ¶ 24.). But Bitcasa has not breached, and will not breach, this provision.

As an initial matter, Bitcasa’s promise to notify and assist users in the event if a “suspen[sion]” or “terminat[ion]” is inapplicable here. As Bitcasa explained to subscribers, the changes announced on October 23, 2014 were designed to enable Bitcasa to continue offering service at cost-effective prices. (Taptich Decl. ¶ 12.) These changes marked not a suspension or termination of service, but a permissible “modification” of Bitcasa’s service, of the type fully contemplated in the TOS. (*See* TOS at 19 (“The Services may continue to change over time as we refine and add more features. We may stop, suspend, or modify the Services at any time without prior notice or liability to you.”).) No provision of the TOS requires Bitcasa to provide notice or data-retrieval assistance in the event of a modification to its services, and Plaintiff does not contend otherwise.

But Bitcasa provided commercially reasonable notice and data-retrieval assistance to users in any event. Despite its skyrocketing costs of server storage, Bitcasa gave users 23 days’ notice of the forthcoming changes, at a price of ▇▇▇ per day, for total charges of ▇▇▇. Incurring further expense, Bitcasa mounted a massive publicity campaign to notify all users, sending numerous emails to all users, posting to Twitter and Facebook, and posting announcement and FAQ documents on its own website. This notice was so robust that Plaintiff concedes that he learned of the change to service on the first day they were announced. (Romack Decl. ¶ 3.) He does not allege, much less proffer any evidence, that any meaningful number of users failed to also learn of the changes as of October 23, 2014. There can, thus, be no question that Bitcasa timely “let [users] know in advance” of the changes. (TOS at 36.)

There also can be no question that the 23-day notice period was more than adequate for all but perhaps a tiny sliver of Infinite plan users. As of the beginning of October, 99.5% of all users (and ▇▇▇ of Infinite plan users) kept 1TB or less on the service. For these users, their data could be migrated to Bitcasa’s upgraded service, in a day or two at most, *with no cost increase over their previous plan.* For the users with between 1TB and 10TB on the service, those users could also migrate their data to Bitcasa’s service, in a matter of days, at the cost of $99 per month

or $999 per year. These users should have had no difficulty migrating or retrieving their data in the 23-day window.

Bitcasa also provided users robust assistance in dealing with the transition, including, where applicable, assistance with migrating and retrieving their data. Before the October 23, 2014 announcement, Bitcasa hired three additional employees to help handle customer service inquiries, for a total of ten full-time customer service representatives in all. Since October 23, the customer support team has processed nearly ▮▮▮▮ help and support tickets, dealing with a variety of issues, most of which were successfully resolved.

All told, Bitcasa's efforts to notify and assist users in retrieving their data were more than "commercially reasonable." California law has long held that the profitability (or lack thereof) of a proposed course of action, along with economic feasibility, are key factors in determining what is commercially reasonable. *See Citri-Lite Co. v. Cott Beverages, Inc.*, 721 F. Supp. 2d 912, 924-26 (E.D. Cal. 2010) (collecting cases); *see also Sempra Energy Res. v. Cal. Dept. of Water Res.*, No. DO43397, 2005 WL 1459950, at *9 n.12 (Cal. App. Ct. June 21, 2005) (commercial reasonableness is a fact intensive inquiry, but factors include economic feasibility and profitability of a proposed course of action). Judged against this standard, there can be no question that Bitcasa's efforts were commercially reasonable, taking into account its ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (at a price tag of ▮▮▮▮ per day), and the tiny fraction of users, if any, who were likely to have any difficulty transitioning their data in the 23-day notice period. Plaintiff thus takes the completely untenable position that commercial reasonableness requires Bitcasa to make heroic ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ all for the questionable benefit of a fraction of a percent of its users. For these reasons, Plaintiff's claim for breach of contract is almost certain to fail.

### b. Plaintiff's implied covenant claim likely will fail.

Plaintiff also is unlikely to prevail on his claim for breach of the implied covenant of good faith and fair dealing, at least because Bitcasa's conduct was expressly authorized and consistent with the express terms of the TOS. The implied covenant cannot operate to "contradict the express terms of a contract" or to "obliterate[] . . . a right expressly given under a written

Cooley LLP
Attorneys At Law
San Francisco

Defendant Bitcasa, Inc.'s
Opposition to Motion for TRO
No. C 14-05005 WHA

contract." *Thrifty Payless, Inc. v. Mariners Mile Gateway, LLC*, 185 Cal. App. 4th 1050, 1061-62 (2010). The TOS here unambiguously gives Bitcasa absolute and sole discretion to change or terminate its services at any time and for any reason. (TOS at 19 ("[Bitcasa] may stop, suspend, or modify the Services at any time without prior notice or liability to you"), *id.* at 36 ("We reserve the right to suspend or end the Services at any time, with or without cause, and with or without notice").) Thus the implied covenant cannot be used to challenge Bitcasa's decision to modify or end its services, or the "tim[ing]" thereof, nor its reason for doing so. *See, e.g.*, *Haggarty v. Wells Fargo Bank, N.A.*, No. 10-02416 CRB, 2012 U.S Dist. LEXIS 143405, at *13-17 (N.D. Cal. Oct. 3, 2012) (covenant of good faith and fair dealing could not limit a provision in a consumer loan contract granting bank "sole discretion" to take particular actions); *see also De Walshe v. Togo's Eateries, Inc.*, 567 F. Supp. 2d 1198, 1203-04 (C.D. Cal. 2008) (grant of "absolute discretion" in a contract meant the covenant of good faith and fair dealing did not apply under California law).

The implied covenant also cannot save Plaintiff's claim that Bitcasa's 23-day notice period left him with insufficient time to retrieve his data. Bitcasa's duty to provide notice, if any, is defined by the provision of the TOS providing that "[i]f we suspend or terminate your use, we will make commercially reasonable efforts to let you know in advance and help you retrieve data …." (TOS at 36; Complaint, ¶ 24.). As discussed above, Bitcasa's efforts to notify and assist users was commercially reasonable in light of all relevant circumstances. The implied covenant cannot be used to impose a notice-and-assistance obligation more onerous that the "commercially reasonable standard" to which Plaintiff agreed. *Cf. Foothill Props. v. Lyon/Copley Corona Assocs.*, 46 Cal App. 4th 1542, 1552 (1996) (implied covenant "may go no farther than to [require a party to] act in a commercially reasonable manner").

### c. Plaintiff's UCL claims are also likely to fail.

Plaintiff's UCL claims are also likely to fail. Plaintiff first asserts a cause of action under the "unlawful" prong of the UCL, apparently based on the purported breach of contract. (*See* Compl.¶ 69.) But California courts "consistently conclude that a breach of contract is not itself an unlawful act for purposes of the UCL," absent evidence that the breach itself was unlawful, fair, or fraudulent. *Ford v. Lehman Bros. Bank, FSB*, No. C 12-00842 CRB, 2012 U.S. Dist.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANT BITCASA, INC.'S
OPPOSITION TO MOTION FOR TRO
NO. C 14-05005 WHA

LEXIS 85600, at *29 (N.D. Cal. June 20, 2012) (collecting cases); *Puentes v. Wells Fargo Home Mortg. Co.*, 160 Cal. App. 4th 638, 645 (2008) (dismissing UCL claims predicated on an alleged breach of contract, without more). Plaintiff's alleged "unfair"-prong claim fares no better because the utility of Bitcasa's conduct—targeted to improving its services, and ensuring its ability to remain a going concern—far outweigh any alleged harm to the Plaintiff—i.e., the payment of $99 or the deletion of his files, which he has the full power to avoid. *Smith v. State Farm Mut. Auto. Ins. Co.*, 93 Cal. App. 4th 700, 718-719 (2001) (UCL unfair-prong claim weighs "the utility of the defendant's conduct against the gravity of the harm to the alleged victim"); *Camacho v. Auto. Club of S. Cal.*, 142 Cal. App. 4th 1394, 1405 (2006) (UCL claim requires substantial consumer injury that the consumer "could not have reasonably avoided"). These claims are likely to fail.

### 2. Plaintiff cannot show irreparable harm because the purported harms are avoidable or compensable in damages.

Plaintiff also cannot obtain a TRO because he does not need court intervention to avoid the deletion of his data. Plaintiff admits that he can avoid the deletion of his data by electing to migrate his data to Bitcasa's new system and pay the $99 monthly fee for storage, which would provide him with an additional month to finish downloading his data if he so chooses. Because Plaintiff can avoid the purported irreparable harm through this simple expedient, he is not entitled to a TRO as a matter of law.

Two related principles foreclose a showing of irreparable injury in these circumstances. First, "if the harm complained of is self-inflicted, it does not qualify as irreparable." 11A Charles A. Wright, *Federal Prac. & Proc.* § 2948.1 pp. 152-53 (1995); *see, e.g.*, *K.D. v. Oakley Union Elementary Sch. Dist.*, No. C 07-00920 MHP, 2008 U.S. Dist. LEXIS 9559, at *33 (N.D. Cal. Feb. 8, 2008) ("[H]arm is not irreparable if self-inflicted."). Second, harm is not irreparable if the plaintiff could have taken reasonably available steps to avoid it. *See, e.g.*, *Daniels Cablevision v. San Elijo Ranch, Inc.*, 158 F. Supp. 2d 1178, 1189-90 (S.D. Cal. 2001) (harm not irreparable where it "will be suffered only should plaintiff [choose particular course of action], or decline to pay the [disputed] fee"); 1 Witkin, Summ. of Cal. Law, Contracts, § 915, p. 1012 (10th ed. 2005

DEFENDANT BITCASA, INC.'S
OPPOSITION TO MOTION FOR TRO
NO. C 14-05005 WHA

& Supp. 2012) ("The plaintiff cannot recover for harm that he or she could have foreseen and avoided by reasonable effort and without undue expense.").

Under longstanding California law, avoidable or self-inflicted harms not only are not irreparable, but they are not even cognizable. In *Henrici v. South Feather Land and Water*, 177 Cal. 442, 450 (1918),[4] a farmer sued the defendant water company for alleged failure to honor the rates of a predecessor company. The farmer had refused to pay for water at the defendant's rates, and as a consequence, he received no water for a period of four years, resulting in damage to his vines, trees, and crops. *Id.* Although the farmer proved breach at trial, the California Supreme Court reversed the jury's verdict, ruling that the farmer had unreasonably failed to mitigate his damages. *Id.* "By paying the excessive price without conceding its correctness," the Court explained, the farmer "could have saved his trees, vines, and crops, and reduced his damage to a comparatively trifling sum. This it was plainly his duty to do." *Id* at 449.

Applying similar principles, courts consistently deny injunctive relief where, as here, the plaintiff can avoid the purported irreparable harm by paying a disputed fee. *See, e.g.*, *Snecma v. Turbine Engine Components Techs. Corp.*, 531 F. Supp. 2d 354, 358-59 (N.D.N.Y. 2008) (no irreparable harm where the defendant "has simply demanded a price higher than the one to which [plaintiff] alleges the parties agreed" because plaintiff "can avoid the alleged irreparable harm . . . by paying the higher price, and then recover monetary damages on the merits in the proper forum"); *Suncom Wireless P.R. Operating Co. v. P.R. Tel. Co*., Civ. 07-1440CCC, 2007 U.S. Dist. LEXIS 37745, at *4 (D.P.R. May 23, 2007) (no irreparable harm where plaintiff could "pay the amount that [the defendant] claims to be in default, thus avoiding suspension of services, while it continues to litigate . . . ."); *Daniels Cablevision*, 158 F. Supp. 2d at 1189-90 (harm not irreparable where plaintiff could avoid it by paying disputed fee); *cf. Lakshmikanth v. Philatelic Leasing*, No. 3-83-0710, 1983 U.S. Dist. LEXIS 12857, at *12 (M.D. Tenn. Oct. 12, 1983) ("[T]he avoidance of the payment of money is inherently an inappropriate subject matter for

---

[4] *Henrici* remains good law today. *See, e.g.*, 1 Witkin Summ. of Cal. Law, Contracts § 915, p. 1012 (10th ed. 2005 & Supp. 2012) (citing *Henrici* for the proposition that mitigable damages are not recoverable); *see also Valle De Oro Bank v. Gamboa*, 26 Cal. App. 4th 1686 (1994) (same).

issuance of an injunction.").

For example, in *Synder v. Axelrod Management*, 77 Civ. 3217, 1977 U.S. Dist. LEXIS 14633 (S.D.N.Y. Aug. 4, 1977), the federal Department of Housing and Urban Development (HUD) increased the rents in a housing project by 11.5% only two months before the tenants' leases were set to expire. *Id.* at *2-4. The plaintiffs sought to enjoin the rent increase, arguing that they faced the irreparable harm of eviction if the rate increase went through. *Id.* at *4. Although the court recognized that eviction would, indeed, inflict irreparable harm, the court refused to issue the injunction, reasoning that the plaintiffs could simply pay the rent increase to avoid eviction while proceeding with their lawsuit challenging the legality of the rate hike. *Id.* at *10. Because the plaintiffs had a reasonable way out, any irreparable harm would be "by choice not necessity." *Id.*

The facts here are no different. Plaintiff can prevent his data from being deleted by paying an amount that he disputes—$99 for one month—while seeking a refund of those amounts in litigation. As in *Snyder*, "Plaintiffs cannot bootstrap their way into drastic relief by electing or threatening to elect to suffer avoidable consequences." *Id.* at *10-11. Moreover, because Plaintiff can seek recovery of any disputed amounts paid in this litigation, he plainly has an adequate remedy at law. *Wells Fargo & Co. v. ABD Ins. & Fin. Servs.*, No. C 12-3856 PJH, 2014 U.S. Dist. LEXIS 121444, at *42-43 (N.D. Cal. Aug .28, 2014) (denying injunction where all claimed harms could be remedied at a later date with monetary damages).

Finally, Plaintiff has failed to show that, even if he lost his data, that harm would be irreparable. Plaintiff says little about the 7.7TB of files he has stored on Bitcasa, except that it includes "photographs and other personal data, …." (Compl. ¶ 39.) But it simply is not plausible that each byte of Plaintiff's 7.7TB of storage—big enough to store 2.7 million photographs—is unique and irreplaceable. [5] Moreover, Plaintiff admits that he has been "feverishly" downloading his data, so he presumably was able to recover *some of his data.* (Compl. ¶ 37.) If Plaintiff was

---

[5] A man who lives the average lifespan in the U.S (78.7 years) would need to take a unique and irreplaceable picture every 15 minutes around the clock from the moment he was born until he died in order to fill up that much storage space.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

able to retrieve even 1TB of data (which he could have done by starting his download on the day he filed his complaint), then he could have recovered the equivalent of at least 330,000 photographs. Plaintiff's choice to file a lawsuit, rather than work to retrieve his purportedly replaceable data, is additional proof that any harm is of his own making. ████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████

**3.     The balance of equities strongly favors Bitcasa.**

The balance of equities weighs overwhelmingly against the entry of a further TRO or injunction. As explained above, complying with the TRO is costing Bitcasa over ██████ a day to continue renting old server space from Amazon Web Services. If the Court enjoins Bitcasa from completing its migration for the full 14 days requested by Plaintiff, Bitcasa will incur more than ██████ in purposeless, unrecoverable costs. These costs are in addition to the costs Bitcasa is now paying to host the migrated data on new servers. Bitcasa simply does not have this margin of error. ████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████

Nor can any purported benefits to absent class members justify the injunction. The overwhelming majority of the users covered by the TRO have no interest in delaying the deletion of their data. As discussed above, the 99.5% of Bitcasa's customers who store less than 1TB of data had more than seven times the time they needed to completely remove their data. (Taptich Decl. ¶ 13) (can download 1TB of data in only 3 days at average broadband speeds).) Even a customer who stored 5TB with Bitcasa would have a substantial margin of error to completely remove their data. Other users have signed up for the new plans and migrated their data over. (Taptich Decl. ¶ 13.) Indeed, only ███ distinct Infinite plan users actually contacted the company to complain about the time they had to remove their data. (Taptich Decl. ¶ 15.) Even if all ███ of these users forced to pay $99 each for an additional month of service, the *combined* cost would be equivalent to less than *eight hours* of the injunction incurred costs to Bitcasa.     Any possible

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANT BITCASA, INC.'S
OPPOSITION TO MOTION FOR TRO
NO. C 14-05005 WHA

benefit to these private plaintiffs are thus outweighed by the ███████████
██████████

###    4.    Plaintiff's proposed TRO is not in the public interest.

The public interest would be harmed by Plaintiff's proposed injunction while its benefits would be enjoyed entirely by private parties. ███████████████████████████████████████████████████████████████████████████████████. (Taptich Decl. ¶ 16.) In contrast the benefit of a TRO would fall exclusively to Plaintiff and other private individuals and would confer not public benefit whatsoever. Plaintiff has not even attempted to argue that granting an injunction would be in the public interest and his request should be rejected accordingly. (TRO Mot. 4-5.)

## V.    CONCLUSION

██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████ The request should be denied.

Dated: November 18, 2014

COOLEY LLP

*/ s / Matthew D. Brown*
Matthew D. Brown

Attorneys for Defendant
BITCASA, INC.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANT BITCASA, INC.'S
OPPOSITION TO MOTION FOR TRO
No. C 14-05005 WHA